```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF IOWA
                        CENTRAL DIVISION


KANSAS BANKERS SURETY COMPANY,      )
A Kansas Corporation,               )   NO. 4:04-cv-10230
                                    )
        Plaintiff,                  )
                                    )   RULING ON PLAINTIFF'S
   vs.                              )   MOTION FOR SUMMARY
                                    )   JUDGMENT AND DEFENDANT'S
FARMERS STATE BANK, YALE, IA,       )   CROSS-MOTION FOR
An Iowa Banking Corporation,        )   PARTIAL SUMMARY JUDGMENT
                                    )
        Defendant.                  )
```

KBS issued a Financial Institution Crime Bond No. 6819IA to Farmers State Bank of Yale, Iowa (FSB). FSB's Vice President, Brian Barber, caused certain bad loans to be made (the Lancaster and Funk loans) and a guaranty entered into which resulted in significant losses to FSB. FSB contends the circumstances evince fraud and dishonesty on Barber's part sufficient to support a claim under the "fidelity" coverage provisions of "Insuring Agreement (A)" in the bond, by which KBS agreed to indemnify FSB for losses described in relevant part as follows:

**INSURING AGREEMENTS**

**FIDELITY**

> (A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
>     Such dishonest or fraudulent act must be committed by the Employee with the manifest intent
>         (a) to cause the Insured to sustain such loss, and
>         (b) to obtain financial benefit for

>>the Employee or another person or entity.
>>However, if some or all of the Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit.

(Id. at 2). KBS has denied the claim and brought a declaratory judgment action seeking a decree affirming it is not obligated on the bond. FSB has counterclaimed for breach of contract and unjust enrichment. The Court has diversity jurisdiction. 28 U.S.C. § 1332(a). The case is before me pursuant to 28 U.S.C. § 636(c). Iowa law controls. The parties have filed cross-motions for summary judgment [40, 53] which have been argued and are fully submitted.

## I. FACTUAL BACKGROUND

There are a number of specific factual disputes, but the big picture is as follows.

Barber was formerly employed at Clarkson State Bank (CSB). The Lancasters and Funks were agricultural loan clients of Barber. Before Barber left CSB in November 2001, CSB had cut off credit to the Lancasters based on their precarious financial situation and the Funks loan were "classified," i.e., problem loans. (KBS App. at 127-130).

On November 29, 2001 Barber joined FSB as a vice president responsible for making agricultural loans. (KBS App. at 130). Barber's personal lending authority at FSB was $75,000; amounts over his limit were to be taken to the bank Board. (Id. at

2

70). While he was at FSB, Barber continued to extend credit to the Lancasters and the Funks, sometimes in amounts over his personal lending authority, and did not tell the bank Board about their poor financial condition. (Id. at 127-142).

In addition to numerous extensions of credit and notes, Barber signed a letter of guarantee for seed financing by PHI Financial Services to the Lancasters. (KBS App. at 85). Barber also entered into an agreement with Mr. Lancaster for the latter to perform custom farming services on farmland Barber owned in Nebraska. Some seed corn used on Barber's farmland was acquired with the loans extended to the Lancasters and Barber allegedly used machinery also acquired with loan money without paying the Lancasters for its use. (Id. at 133). Barber disclosed none of this information to the bank.

With respect to the Funks, Barber made loans to Mr. Funk's mother and his uncle, but the proceeds were paid to the Funks. (KBS App. at 132, 135-137). The Funks were involved in a dispute with Barber's former employer CSB and Barber arranged for $40,000 in loan proceeds be applied in settlement of the matter. (Id. at 137-38).

On or about July 25, 2002 the FDIC discovered the Funks' "strawman" loans and alerted Doug Hemphill, president of FSB. The bank Board met that evening and Barber was terminated. FSB then made a claim on the bond issued by KBS. (KBS App. at 76-80).

PHI filed suit against FSB for payment on the letter of guaranty after the Lancasters defaulted on that loan, PHI v. FSB, Case No. CL 92461 in the Iowa District Court for Polk County. (KBS App. at 97, 99). FSB brought in Barber as a third-party, alleging breach of fiduciary duty, fraudulent nondisclosure, and fraudulent misrepresentation in connection with the Lancaster and Funk loans. (Id. at 193). FSB reached a settlement with PHI and proceeded to try its third-party claims against Barber in Iowa state court case. (Id. at 182). The trial court found Barber had breached his fiduciary duty to the bank, but had not engaged in fraudulent activity. On July 2, 2004 the court awarded FSB a judgment in the amount of $486,159.67 plus interest. (Id. at 191-233).

The Lancasters and the Funks filed for bankruptcy in the United States Bankruptcy Court for the District of Nebraska in 2003. FSB brought adversary proceedings in both cases. FSB also brought suit against Donald Funk, an uncle of Robert Funk who acted as a "strawman" with respect to a $70,000 loan, and obtained a default judgment against him in the amount of $43,004.67 plus interest. (KBS App. at 135, 180).

After receiving notice of FSB's claim for indemnity under the bond in January 2004, KBS filed the present declaratory judgment action on April 23, 2004.

4

## II.   STATUTORY BOND

The bond is tightly crafted to avoid indemnifying merely bad business decisions resulting in loan losses. Its construction is affected by whether the bond is viewed as a statutory bond, as argued by FSB, or purely a common law contract bond as argued by KBS. FSB relies on Iowa Code § 524.705 which requires officers and employees of state banks to give a bond protecting the bank from loss due to their malfeasance. The statute states:

> The officers and employees of a state bank having the care, custody, or control of any funds or securities for any state bank shall give a good and sufficient bond in a company authorized to do business in this state indemnifying the state bank against losses, which may be incurred by reason of any act or acts of fraud, dishonesty, forgery, theft, larceny, embezzlement, wrongful abstraction, misapplication, misappropriation, or other unlawful act committed by such officer or employee directly or through connivance with others, until all of the officer's or employee's accounts with the state bank are fully settled and satisfied.

Id. I agree with FSB that the bond is a statutory bond governed by the statute. In First American State Bank v. Continental Ins. Co., 897 F.2d 319 (8th Cir. 1990), the Eighth Circuit, relying on Iowa case law and § 524.705, held that a bond with similar coverage language was a statutory bond. Id. at 325 (citing American Trust & Savings Bank v. United States Fidelity & Guaranty Co., 418 N.W.2d 853, 854 (Iowa 1988)). The Eighth Circuit's discussion was not *dicta* as suggested by KBS because a finding that the bond was a

statutory bond was essential to the court's application of the liberal construction rule accorded such bonds. Id. In American Trust the Iowa Supreme Court had also held a bond with similar coverage language to that here was a statutory bond by reason of § 524.705. Id. (citing State Surety Co. v. Lensing, 249 N.W.2d 608, 611 (Iowa 1977)).

KBS refers the Court to no Iowa authority to the contrary. It points out, however, that there is a "note" on the lower left-hand corner of first page of its bond form which states: "This is a Fidelity Crime Bond. It is not a faithful performance duty bond or a statutory bond." FSB's president states by affidavit the bond was purchased to comply with the requirements of § 524.705. There is no evidence in the record concerning what representations, if any, were made in connection with the acquisition of the bond. However, if a bond is of a type required by statute the general rule is that "[i]t is presumed that the intention of the parties was to execute such a bond as the law required." 12 Am. Jur. 2d Bonds § 25 at 385 ("Am. Jur."). This mirrors what the Iowa Supreme Court said long ago with respect to a contractor's bond:

> . . . where the situation is such as to require a statutory bond, and the bond given . . . conforms in material and essential respects to the requirements of the statute . . . the parties will be held to have intended to make a statutory bond, notwithstanding the omission from the bond of other conditions

>required by the statute, or the inclusion of stipulations contrary to the statute.

Philip Carey Co. v. Maryland Cas. Co., 201 Iowa 1063, 1069, 206 N.W. 808, 810 (1926).

In view of the evidence of FSB's intention, and the language of the bond which conforms in material respects to the language of the statute, I do not believe the note disclaimer standing alone conclusively rebuts the presumption a statutory bond was intended.

Assuming the bond is a statutory bond, it must be liberally construed in light of the purpose for which it was required, coverage required by the statute is read into the bond, and conditions not described by the statute are considered surplusage. See First American, 897 F.2d at 325; United Fire & Cas. Co. v. Acker, 541 N.W.2d 517, 518-19 (Iowa 1995); American Trust, 418 N.W.2d at 854; State Surety Co., 249 N.W.2d at 611; Am. Jur. § 26. I do not believe that these rules of construction require the direct loss and manifest intent requirements of the bond be considered surplusage as suggested by FSB. In First American the Eighth Circuit viewed Iowa case law as holding "a *per se* direct loss [occurs] at the time of the initial wrongdoing," which in the loan context means a loss occurs when bank funds are disbursed as part of a "fraudulent loan scheme," 897 F.2d at 325 (citing American Trust, 418 N.W.2d at 855), a result the court viewed as consistent with § 524.705.

As to "manifest intent," it is true the statute does not expressly articulate an intent requirement, however, the concepts of "fraud" and "dishonesty" inherently incorporate an element of intent (one cannot unintentionally defraud or be dishonest), and all of the crimes and other unlawful acts expressly described in the statute require proof of intent. Some are specific intent offenses (i.d., forgery) and other general intent offenses (i.e., misappropriation). The statute thus requires a bond providing protection against intentional misconduct. In view of the rule of liberal construction, I believe the Iowa Supreme Court would be likely to employ an intent standard consistent with the "clearly evident" or "results substantially certain to follow" standard approved by the Eighth Circuit in Bancinsure, Inc. v. BNC Nat'l Bank, 263 F.3d 766, 770-71 (8th Cir. 2001), a case involving North Dakota law. From the discussion of an instruction the court had upheld in a prior case it is apparent the intent standard the court had in mind is similar to the concept of general intent in criminal law; the fact finder may draw an inference of intent on the basis that "a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." Id. (quoting First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co., 2 F.3d 801, 813 (8th Cir. 1993) and citing FDIC v. Oldenburg, 34 F.3d 1529, 1539 (10th Cir. 1994)(holding manifest intent "exists when a particular result is substantially certain to follow from the

employee's conduct")). In First Dakota the Eighth Circuit had held the manifest intent requirement, so construed, was consistent with a South Dakota statutory bond requirement not unlike § 524.705. 2 F.3d at 808; see SD Cod. Laws § 51A-3-37.

Whether the exclusionary clause excluding loan losses unless the employee is in collusion with the borrower and received a financial benefit is consistent with § 524.705 presents a closer question. The statute does not differentiate between loan losses and other kinds of losses, it contains no limitation to losses in connection with which the employee received a financial benefit, and it mandates coverage for losses for acts committed "directly" by the employee or "through connivance with others." On the face of it the limitations in the exclusionary clause seem inconsistent with the statute, in which case they ought to be disregarded. What gives the Court pause is that in First Dakota the Eighth Circuit also held that a similar financial benefit requirement with respect to loan losses was enforceable as part of a statutory bond under South Dakota's statute because the bond had been approved by South Dakota authorities and the requirement was not seen as inconsistent with the underlying purpose of the statute. 2 F.3d at 808. There is no material distinction to be made between the South Dakota and Iowa statutes with respect to the financial benefit issue. Presumably the KBS bond has been approved by the Iowa Insurance Commissioner for sale to financial institutions in this state. That

the Iowa Supreme Court would agree the financial benefit requirement is consistent with the purpose of the statutory bond is less certain. For the present, in accord with the reasoning in First Dakota, the Court will give effect to the financial benefit limitation in the case of loan losses.[1]

KBS contends the evidence is insufficient to establish direct loss, dishonest or fraudulent acts, manifest intent, or financial benefit to Barber. As to the first of these, if Barber was engaged in fraudulent or dishonest conduct in making the loans a *per se* direct loss occurred when the money left the bank. First American, 897 F.2d at 325.

"Dishonest" and "fraudulent" in a statutory bond are interpreted broadly under Iowa law. First American, 897 F.2d at 325. They include "acts which show a 'want of integrity' or 'breach of trust,'" as well as "acts in disregard of an employer's interests, which are likely to subject the employer to loss." Federal Deposit Ins. Corp. v. Nat'l Surety Corp., 281 N.W.2d 816, 819 (Iowa 1979). There is substantial evidence, as the state court found, that any reasonable banker in Barber's position would have known the loans in question would not likely be repaid, and he was

---

[1] The requirement of collusion in addition to a financial benefit in order to avoid the exclusionary clause in Insuring Agreement (A) is plainly inconsistent with the language of § 524.705 as the statute expressly provides for the indemnification of losses for unlawful acts committed by the employee directly or through collusion. Collusion, however, is not the issue in connection with the present motions.

so neglectful of his duties to the bank that he committed an actionable breach of fiduciary duty. There is evidence to support the state court's finding that Barber served the interests of the Lancasters and Funks rather than the bank, and that to secure approval of the loans by FSB's board he failed to disclose material information about the financial condition of the borrowers, and made so-called "strawman" loans to members of the Funk family. Under the liberal construction standard applicable to statutory bonds in Iowa there is a genuine issue of material fact about whether Barber engaged in dishonest or fraudulent conduct.

"Manifest intent" is a fact issue normally ill-suited to resolution on summary judgment. "[W]here an individual's conduct falls somewhere between the two extremes of embezzlement and simple poor judgment, intent becomes a question of fact." Bancinsure, Inc., 263 F.3d at 771 (quoting Oldenburg, 34 F.3d at 1540). That is the case here.

I agree with FSB that where a series of fraudulent or dishonest loan transactions forming a part of the same course of conduct is shown it is not necessary to establish that the employee received a financial benefit from each individual loan transaction. The exclusionary clause does not by its terms so require, but rather refers to receipt of a benefit from "the transactions," suggesting the aggregate. FSB contends Barber received a benefit from the Lancaster loans in that they enabled Lancaster to stay

11

afloat financially and assist Barber by custom farming Barber's Nebraska farmland, helping Barber's son irrigate the ground, and compensating Barber's son for his work in helping Lancaster farm Barber's land. Barber and Lancaster bought seed, chemicals, and fertilizer together and as a result obtained a volume discount. Barber also allegedly had possession of and used equipment belonging to Lancaster purchased from the loan proceeds. Arguably all of this gave Barber an interest in Lancaster's farm operation sufficient to amount to a financial benefit.

The picture is more attenuated in the case of the Funk loans. Funk allegedly threatened litigation against CSB over unfulfilled promises made by Barber while employed by CSB to induce Funk to move a dairy operation. FSB contends Barber was involved in diverting loan proceeds from FSB to CSB which were used to help Funk and CSB settle their differences under a release which benefitted Barber as a former CSB employee. On the present record the interest here seems remote and speculative, but I decline to render a piecemeal summary judgment and will hear the evidence on the point.

### III.   ISSUE PRECLUSION

In the state court proceeding FSB sued Barber for breach of fiduciary duty and fraud. FSB prevailed on the fiduciary duty claims, but not the fraud claims. Whether Barber engaged in self-dealing with respect to the loans was in issue on the fiduciary

12

duty claims because if self-dealing were demonstrated the burden would have shifted to Barber to prove the transactions were fair and reasonable to FSB. (KBS App. at 221). The state trial court concluded FSB had not established self-dealing with respect to the Lancaster loans. The court did not discuss the self-dealing issue with respect to the Funk loans, and perhaps it had not been raised. Concerning the Lancaster loans, the state trial court said it was not convinced Barber had "improperly benefitted personally from FSB's loans to the Lancasters," that there was "simply no evidence that Barber used his capacity as an officer of FSB to confer upon himself an impermissible benefit," and it was not convinced "Barber was motivated by a desire to benefit himself financially." (Id. at 206, 222). Accordingly, the trial court"[did] not conclude the situation arises to the level of self-dealing requiring a shifting of the burden of proof . . . ." (Id. at 222).

At issue in this case is whether Barber received a financial benefit in connection with the loans.

> Under Iowa law, collateral estoppel applies if (1) the issues in the current and prior actions are identical, (2) the issue was raised and actually litigated in the prior action, (3) the issue was material and relevant to the disposition of the prior action, and (4) the determination was necessary and essential to the prior judgment.

National Union Fire Ins. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003), cert. denied, 541 U.S. 939 (2004) (citing Dolan v. State Farm Fire & Cas. Co., 573 N.W.2d 254, 256

(Iowa 1998)); Gilbert v. Constitution State Serv. Co., 101 F. Supp. 2d 782, 787 (S.D. Iowa 2000). Whether in respect to the Lancaster loans Barber was motivated to benefit himself personally, or improperly received a benefit so as to amount to self-dealing is different than the factual issue of whether Barber received a financial benefit at all. The state court factual findings do not preclude a finding that Barber received such a benefit, indeed it suggests he may have been benefitted by his custom farming relationship with the Lancasters and discount on seed he received from purchasing seed with the Lancasters whose farming operation, FSB alleges, was kept going by the loans. Accordingly, principles of issue preclusion do not mandate a judgment in KBS' favor.[2]

---

[2] It is not necessary to conclusively decide the question now, but it may be appropriate to give issue preclusive effect to certain subsidiary facts found by the trial court including Barber's lack of motivation to benefit himself personally, but "only to help these farmers." (KBS App. at 206, 232).
   FSB contends issue preclusion principles should not apply because in state court FSB had to prove its fraud claims by a preponderance of the clear, satisfactory and convincing evidence, a higher standard than simple preponderance of the evidence applicable to the claims in this case, and FSB has discovered additional material evidence since the state court trial. The difference in burden of proof is not dispositive on the issue because Barber's motivation and whether or not he received a benefit from the loans was relevant to both the fiduciary duty and fraud claims in state court, and was discussed by the court in the context of the former. The burden of proof on a breach of fiduciary of duty claim is by a preponderance of the evidence. The Court doubts the mere fact FSB has come across additional evidence in preparing for this trial would avoid the issue preclusive effect of issues decided in the state court if FSB had a full and fair opportunity to litigate the issues in state court.

**IV.  CONCLUSION**

This is a highly fact-laden case. Both sides have filed summary judgment motions based on their separate constructions of Insuring Agreement (A) in the bond, neither of which have been accepted *in toto*. The ultimate issues in this case are different enough from those decided in the state case to avoid the bar of issue preclusion. In the Court's judgment, neither side has demonstrated an absence of genuine issues of material fact in order to warrant summary judgment. Disposition by trial is the appropriate means to resolve the issues in this case.

Motions [40, 53] **denied**.

IT IS SO ORDERED.

Dated this 21st day of November, 2005.

_____
ROSS A. WALTERS
CHIEF UNITED STATES MAGISTRATE JUDGE